BERNARD E. BARNES *et al. v.* PATRICK D. KOONTZ

(No. 7198)

Submitted March 23, 1932.   Decided March 29, 1932.

*E. B. Dyer* and *W. E. R. Byrne,* for appellants.

*Arthur S. Dayton* and *W. Chapman Revercomb,* for appellee.

HATCHER, PRESIDENT:

This suit is for an accounting on an alleged agreement relating to the sale of certain shares of corporate stock by

plaintiff, B. E. Barnes, to defendant, P. D. Koontz. The agreement alleged is stated in the following letter written by Barnes to Koontz on the next day after the sale:

"Mr. P. D. Koontz,
City.

Dear Pat:

While the details of our recent trade of 676 shares of West Virginia Preferred Stock are still fresh in our minds, I think it a good plan to write you this letter.

1st. This is not a legal document and is in no way binding on you, and is not to be signed, but merely used as a memorandum.

2nd. I sold you 676 shares of West Virginia Preferred Stock at $20.00, although Larner would have paid me more. (I did not get a firm offer from Larner, but he intimated to Henry Lewis that he would buy this block at a price higher than I had sold him the other block). OK  B.E.B.

3rd. This stock was bought by you solely for its voting power and not as a speculation.

4th. If at some later date you decide to sell your own personal stock, that you will then include the 676 shares which I sold to you, and rebate me if sold at over $20.00.

Your judgment is to be absolute and I am not to be consulted or kept informed.

6th. That I now have 49 shares of West Virginia Preferred Stock, and you are to have the refusal of any offering I get on this block.

7th. As long as I keep the above 49 shares, you are to have my proxy, or if I am present at any meeting, will vote it as directed by you.

If this is not satisfactory to you, please advise me.

Yours very truly,
(Signed) PETE BARNES."

Koontz owned 314 shares of this stock at the time he purchased from Barnes. Barnes says that Koontz confirmed orally the agreement stated in the letter; Koontz says that he repudiated it orally. Evidence was taken tending to support Barnes as well as evidence tending to support Koontz. The lower court disposed of the case as follows:

> "* * * On consideration of all which the court is of opinion to dismiss the bill in this case, for the reason that the contract relied upon by the plaintiffs, if established, would be in restraint of alienation and not enforcible; and it is accordingly so adjudged, ordered and decreed, and this case is dismissed."

Koontz would justify the ruling of the court on the following grounds:

> "The restraint of alienation is created by the terms of the alleged agreement upon two blocks of stock, to-wit, first the stock which Barnes alleges he sold Koontz, if that stock could not be sold by Koontz until Koontz sold his own personal stock; secondly, a restriction was likewise placed upon the personal stock of Koontz because he could not sell his own stock without selling the 676 shares at the same time."

Koontz's brief relies generally on two classes of cases. One class denies authority in a corporation to control the transfers of stock by its stockholders, citing 7 R. C. L. 263 and cases in notes; and the other class denies the right of a grantor to forbid the alienation of the property sold. Contravention of public policy is the ground for the denial in both classes. Prominent among the citations of the second class are *DePeyster* v. *Michael,* (N. Y.) 57 Am. Dec. 475, and *White* v. *White,* 108 W. Va. 128, 150 S. E. 531. That case voids a restriction in a deed against alienation to any person of the Ethiopian race. While such a restriction is ordinarily referred to as a restraint, it is generally a prohibition—a direct denial of the right to alien under a certain condition. The *DePeyster* case was quoted in the *White* case

in support of our conclusion that the limitation on the alienability of a fee simple estate was void. In so far as the quotation from the *DePeyster* case covers other matters, it was beyond the proposition immediately under consideration in the *White* case and not in harmony on principle with our case of *Paull* v. *Railroad Co.*, 72 W. Va. 263, 78 S. E. 100. We approve *White* v. *White* and also approve the *DePeyster* case as far as it holds ''condition in grant in fee that grantee shall not alien is void.''

Neither class of the decisions relied on by Koontz applies here. The contract alleged by Barnes does not attempt in any direct way to interfere with, control or prohibit the sale of the stock by Koontz. On the contrary, it expressly agrees that the judgment of Koontz on the matter is *absolute,* and that Barnes is not even *to be consulted or kept informed.* Koontz's brief, contending that the requirement that he sell the Barnes stock (676 shares) in connection with the stock he owned prior to the Barnes purchase (314 shares) restricted the sale of the stock, asserts: ''It is a matter of judicial knowledge that often property in small lots may be sold where sale in larger lots is impossible.'' It is also a matter of judicial knowledge that a demand for large blocks of corporation stock frequently exists, and in case of such demand that the stock brings more than in sales of only a few shares. The reference in the letter to the Larner offer indicates a market for a large block of the stock. So we cannot declare judicially that the requirement complained of would retard the sale of the stock.

Counsel for Koontz cited in oral argument the case of *Bias* v. *Atkinson,* 64 W. Va. 486, 63 S. E. 395. The contract in that case was declared illegal because it would have dealt unfairly with the minority stockholders. That case does not apply here, as no one is affected by the alleged contract but Koontz and Barnes.

Suppose we regard the alleged agreement as tending to restrain a sale of the stock. It is not the law that all restraints on trade are illegal. The right of *reasonable restriction* is recognized by all modern authorities. Where no public right is affected, a restraint is regarded as *reasonable*

which is incidental to the sale and gives merely a fair protection to the party imposing it, regard being had to the nature of the transaction. *Boggs* v. *Friend,* 77 W. Va. 531, 535-6, 87 S. E. 873; *McClure* v. *Cook,* 39 W. Va. 579, 20 S. E. 612; Page on Contracts, (Ed. 1919-1929), section 777; 2 Elliott on Contracts, secs. 799 and 814; 13 C. J., subject Contracts, secs. 418, 419; 6 R. C. L., subject Contracts, secs. 193, 194. If Koontz bought the Barnes stock, not for speculation, but merely for its voting power and agreed that Barnes should have any increment above $20.00 when Koontz saw fit to sell it (as the letter states), then the exaction that the Barnes stock be sold with the Koontz stock was assuredly a fair protection to Barnes and nothing more. If Koontz, an experienced business man, was willing to buy on that condition in order to obtain the stock—and the public is not inconvenienced—what occasion for the courts to interfere? The argument that a contract is against public policy is a very indefinite one. ''The public policy of the state varies from time to time.'' *MacGinnis* v. *Boston Co.,* 29 Mont. 428, 461, 75 P. 89, 97. What is public policy is frequently a matter of mere personal inference, which may change as the personnel of the judiciary changes. But as that great chancellor Sir George Jessel well said: ''If there is one thing which more than another, public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting.'' *Printing Co.* v. *Sampson,* 19 L. R. 462, 465. Furthermore, the judicial power to declare a contract void as attended with injury or inconvenience to the public, has been said to be a very delicate one, and should be exercised only in cases free from doubt. Greenhood on Public Policy, p. 116, Rule CXXIX, and cases cited. Consequently, courts do not ordinarily consider illegal, contracts between stockholders which impose conditions on the sale of stock, such as the one in question. ''Nor is an agreement made between a like number of stockholders (a majority) in regard to holding their stock and selling the same together, invalid and in contravention of public policy.'' *Havemeyer* v. *Havemeyer,* 43 N. Y. Sup. Ct. 506. See generally, *Smith* v. *Ry Co.,* 115 Cal. 584, 605, 47 P. 582; Greenhood, supra, p.

500, Rule CCCCXXIV, and cases cited; III Cook on Corporations, (8th Ed.), sec. 622c; 6 Thompson on Corporations, (3rd Ed.), Article 4.

Another contention of Koontz against the validity of the alleged contract is that it is not definitely limited in time. Some of the old decisions support that contention, but that defect is no longer serious, as courts construe such contracts as contemplating only a reasonable time, etc. See opinion in *Boggs* v. *Friend, supra,* p. 536.

Another contention is that the indefinite separation of the voting power from the ownership of the 49 shares of stock retained by Barnes, is against public policy. We do not concede to Koontz the right to raise that point as he would not suffer from that provision. However, *Smith* v. *Ry. Co., supra,* p. 606, explicitly declares: "Neither is it illegal nor against public policy to separate the voting power of the stock from its ownership." An *irrevocable proxy* given by the owner of stock is also held not contrary to public policy "or open to objection", in *Brown* v. *Steamship Co.,* 5 Blatchford (U. S.) 525.

Therefore, we reverse the decree of the lower court and remand the cause for decision on the merits.

*Reversed and remanded.*